AO 102 (01/09) Application for a Tracking Warrant Auth Mannion

# UNITED STATES DISTRICT COURT
for the
Eastern District of Pennsylvania

| | |
|---|---|
| In the Matter of the Tracking of<br>*(Identify the person to be tracked or describe<br>the object or property to be used for tracking)*<br>a UPS package addressed to 2600 Welsh Road,<br>Apartment No. 50, Philadelphia, PA 19152 bearing<br>tracking number 1Z7A068RPW60280593 | Case No. 20-381-1 |

## APPLICATION FOR A TRACKING WARRANT

I, a federal law enforcement officer or attorney for the government, have reason to believe that the person, property, or object described above has been and likely will continue to be involved in one or more violations of _21_ U.S.C. §§ _846, 841_ . Therefore, in furtherance of a criminal investigation, I request authority to install and use a tracking device or use the tracking capabilities of the property or object described above to determine location. The application is based on the facts set forth on the attached sheet.

- ☒ The person, property, or object is located in this district.
- ☐ The person, property, or object is not now located in this district, but will be at the time of execution.
- ☐ The activity in this district relates to domestic or international terrorism.
- ☐ Other:

The tracking will likely reveal these bases for the warrant under Fed. R. Crim. P. 41(c): *(check one or more)*
- ☒ evidence of a crime;
- ☒ property designed for use, intended for use, or used in committing a crime;
- ☒ contraband, fruits of crime, or other items illegally possessed;
- ☐ a person to be arrested or a person who is unlawfully restrained.

☐ I further request, for purposes of installing, maintaining or removing the tracking device, authority to enter the following vehicle or private property, or both:

☒ Delayed notice of _30_ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*[handwritten:] Cufmuelen staten*
*DaCastro USMS*
*3-9-20*

Sworn to before me and signed in my presence.

Date: 3/7/2020

City and state: New Hope, Pennsylvania

*Applicant's signature*

Special Agent James Crockett, DEA
*Applicant's printed name and title*

*per auth of Hon.*
*D Strawbridge in*
*the presence*
*of AUSA Mannion*

David Strawbridge
*Judge's signature*

Hon. David R. Strawbridge, U.S. Magistrate Judge
*Printed name and title*

# UNITED STATES DISTRICT COURT
for the
Eastern District of Pennsylvania

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>2600 Welsh Rd Apt#50 Philadelphia, PA 19152,<br>more fully described in Attachment A | )<br>)<br>) Case No. 20-381-2<br>)<br>)<br>) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*

See Attachment A.

located in the    Eastern    District of    Pennsylvania    , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. Sections 841 and 846 | possession and distribution of controlled dangerous substances and conspiracy to possess and distribute controlled dangerous substances |

The application is based on these facts:

See Attached Affidavit which incorporates Attachments A and B.

☑ Continued on the attached sheet.

☐ Delayed notice of ___ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Confirmed as Stated*
*David Strawbridge USMJ*
*3-9-20*

Sworn to before me and signed in my presence.

Date:   March 07, 2020

City and state:   New Hope, Pennsylvania

_____
Applicant's signature

James W. Crockett, Special Agent
Printed name and title

_____
Judge's signature

Honorable David Strawbridge, U.S. Magistrate Judge
Printed name and title

## AFFIDAVIT

I, James W. Crockett, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION

1. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. I am a Special Agent of the United States Drug Enforcement Administration and an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18 of the United States Code. I am empowered to conduct investigations of and to make arrests for, offenses enumerated in 18 U.S.C. Section 2516.

2. I make this Affidavit in support of an application for an anticipatory search warrant, authorizing agents to search 2600 Welsh Road, Apartment No. 50, Philadelphia, PA 19152 (the "SUBJECT LOCATION"), upon the acceptance of a UPS Package addressed to the SUBJECT LOCATION bearing the tracking number 1Z7A068RPW60280593 (the "SUBJECT PARCEL") into the SUBJECT LOCATION. As described below, there is probable cause to believe that the SUBJECT LOCATION contains evidence, fruits, and instrumentalities of the narcotics trafficking offenses under investigation.

3. I also make this Affidaivt in support of an application for inclusion of a GPS Tracking Device in the SUBJECT PARCEL.

### AGENT BACKGROUND

4. I am currently assigned to the DEA Philadelphia Task Force Group 51 ("TFG-51"). I have been employed by DEA since 2016. As a part of my official duties, I investigate criminal violations of the federal narcotics laws, including, but not limited to, Title 21, United

States Code, Sections 841(a)(1), and 846. I have received special training in the enforcement of laws concerning controlled substances, drug trafficking organizations (DTOs) and money laundering as it relates to the laundering of DTOs' drug proceeds. During my employment with DEA I have conducted and supervised numerous investigations involving unlawful importation, exportation, manufacture, possession with intent to distribute and distribution of narcotics; violent gang activity; the laundering of narcotics proceeds and monetary instruments derived from narcotics activities; and conspiracies associated with narcotics offenses and violent crimes. These investigations have involved the debriefing of defendants, witnesses, and informants; conducting surveillance; executing search warrants; seizing narcotics and narcotics-related assets; seizing weapons; and making arrests. I have participated in several investigations involving wire intercepts. I have also assisted on several state and federal wiretaps that led to numerous arrests and seizures. I have attended the DEA academy, as well as other narcotics related classes during the course of my career. Prior to my employment with DEA, I was Federal Air Marshal within the Department of Homeland Security/Transportation Security Administration for over four years.

5. Through the course of my career, I have become familiar with the methods employed by narcotics traffickers and gang members to smuggle, transport (including by way of mail or common carrier), safeguard, and distribute narcotics, commit extortion and other violent crimes, and to collect and launder proceeds of illicit activity. Through these efforts, I have become familiar with the general modes and operations of criminals undertaking these activities, as well as with the investigative techniques that are useful and viable in certain situations, and those which are not.

6. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## TRAINING AND EXPERIENCE

7. Based on my training and experience, along with discussions with other agents about their experience, I have become familiar with the mechanics of the parcel delivery services and have developed a good understanding of the appeal these services have for those who choose them for the illegal transportation of controlled substances. Parcel delivery services offer rapid and dependable service for most metropolitan areas. Parcels are guaranteed for delivery in the number of specified days, with a refund if the parcel does not meet the service standards. To the drug smuggler, the refund is a minor consideration, but parcels delayed beyond the normal delivery time serve to alert the recipient that the authorities may have discovered the controlled substances. Additionally, parcel delivery services use assigned label numbers, which make it easy for the parcels to be tracked. The sender is given a time of shipment, plus the weight of the parcel.

8. Based on my training and my experience with the DEA, and my discussions with other agents about their experience, I have become familiar with the mechanics of the parcel delivery services and have developed a good understanding of the appeal these service have for those who choose them for the illegal transportation of controlled substances. In particular, I know the following:

   a. Drug traffickers often use any means available to them to transport narcotics. One common method of smuggling drugs is to ship narcotics via the United States Mails,

including Priority Mail parcels used for scheduled delivery, and other overnight carriers.

b. Drug traffickers commonly maintain books, records, receipts, notes, ledgers, electronic data, and other items relating to the importation, transportation, ordering, purchase, and distribution of illegal drugs at their residence or at the location at which their trafficking activities are being conducted, including keeping tickets, notes, receipts, passports and other documents at their residence or the location where they conduct trafficking activities.

c. Records indicative of occupancy are often maintained at drug trafficking locations, including residency and ownership of premises, including but not limited to utility and telephone bills, overnight mail receipts, bank statements, deposit and withdrawal slips, savings books, investment statements, loan statements, other financial institution statements, and federal and state tax returns, canceled envelopes, rental, purchase or lease agreements, identification documents and keys.

d. Drug traffickers involved in drug dealing commonly use certain paraphernalia to package and prepare controlled substances for distribution. The paraphernalia includes but not limited to, packaging materials (such as plastic baggies, paper bindles, glass jars, wrapping paper, and cellophane, etc.), scales to weigh controlled substances, and cutting agents and diluents to stretch the quantity of the controlled substance so they can increase their supply and profit.

e. Drug traffickers often maintain records of their transactions. Even after the drugs are sold, documentary records often remain for long periods of time, even years, to memorialize past transactions, the status of accounts receivable and accounts payable,

and the names and telephone numbers of suppliers, customers, and co-conspirators. These records can be maintained on paper, such as business and personal ledgers and diaries, calendars, memoranda, pay-owe sheets, IOUs, miscellaneous notes, money orders, customer lists, and telephone address books. The same records also can exist in electronic form on computers and in computer software, mass storage devices such as thumb drives and computer discs stored outside the computer.

f. Drug traffickers often maintain records in electronic organizers. Records can reflect names, addresses and/or telephone numbers of associates and co-conspirators, the sale and purchase of controlled substances, customer lists, and amounts of money owed to the trafficker by his customers, and by the trafficker to his suppliers. Records often indicate locations and distribution points of controlled substances, and the purchase of materials, supplies and articles used by the trafficker, and by co-conspirators in the distribution of controlled substances. Records frequently include the identification of properties such as real property or vehicles owned, rented, leased, controlled, or otherwise utilized by the trafficker and his/her co-conspirators in the distribution of controlled substances. These records include property rental and ownership records such as deeds of trusts and lease and purchase agreements, and vehicle registration, rental, and ownership information.

g. Drug traffickers often travel domestically and internationally to facilitate their trafficking. Evidence of foreign and domestic travel by persons engaged in illegal drug trafficking includes travel itineraries, airline tickets, receipts related to travel such as car-rental receipts, fuel receipts, and hotel receipts, and passports and visas and their contents.

h.  Drug traffickers usually sell their product for cash. For example, one kilogram of heroine can sell for approximately $50,000 and one kilogram of heroine can sell for approximately $60,000. Therefore, drug dealers are likely to large sums of cash on hand both as proceeds of sales and to purchase their own supplies. In addition, drug dealers often have other assets generated by their drug business, or purchased with cash earned, such as precious metals and stones, jewelry, real estate, vehicles, and other valuables.

i.  Drug traffickers often try to legitimize profits from the sale of drugs. To accomplish these goals, drug traffickers utilize foreign and/or domestic banking institutions and their attendant services, and real estate and businesses, both real and fictitious. They also try to secrete, transfer, and conceal the money, by (a) placing assets in names other than their own to avoid detection while maintaining control, (b) laundering money through what appears to be a legitimate business or businesses, (c) hiding the money in their homes, safes, and safety deposit boxes, or (d) using the money to buy assets which are hard to trace. This evidence is useful in a criminal prosecution, and it also is useful in identifying real and personal property that can be seized and forfeited by the government under existing laws.

j.  Evidence of significant, unexplained income of drug dealers, or of the acquisition and concealment of money and assets from drug sales, can be found on banking and investment account statements, credit card account statements, canceled checks, money orders, deposit slips, check and savings books, business and personal ledgers, accounting records, safe deposit box records and keys, federal and state tax records, rental receipts, rental agreements, utility bills, overnight mail receipts, telephone bills,

loan statements, records reflecting ownership of real or personal property (such as deeds of trust or vehicle registration, insurance, and ownership information), vehicle and property rental records, lease and purchase agreements, and canceled mail. These records can be maintained on paper, but also can be maintained as computer data on computers and in computer software and computer discs. Also, records can be maintained in electronic organizers.

k. Drug traffickers typically use telephones and other communication systems, counter-surveillance devices, and related devices in their drug trafficking activities. Information stored in electronic form on all of the above devices can provide evidence of drug trafficking and the identity of associates. For example, numbers stored in the telephones (such as caller ID lists reflecting recently received calls, speed dial lists of names and/or telephone numbers, and logs of outgoing and incoming calls) can provide evidence of who the drug dealer is calling, and thus the identity of potential associates. Pagers, cellular telephones, and other communication devices can contain similar information. Also, logs from fax machines can be evidence of messages sent and received, and the corresponding telephone numbers of possible associates and co-conspirators. Often, telephone answering machines are used to take messages. The incoming messages can provide evidence of drug trafficking and the identity of associates while the outgoing message can provide evidence of who controls the telephone line.

l. Drug traffickers often take, or cause to be taken, photographs and/or videos of themselves, their associates, their property and their drugs. They usually maintain these

      photographs and/or videos in their residences, businesses, adjacent garages, outbuildings, and cars.

  m. Drug traffickers often maintain firearms and ammunition on their person or in their homes, businesses, or cars to protect themselves and their drugs and drug profits. They also can use firearms to intimidate associates and others. They also may maintain indicia of firearms such as receipts for firearms and ammunition, boxes for firearms and ammunition, and instruction manuals and other documentation for firearms and ammunition.

  n. Drug traffickers involved in large-scale drug trafficking and those who assist them frequently conceal in locations known as "stash-houses" caches of drugs, drug paraphernalia, firearms, large amounts of currency, and other evidence of drug dealing.

## BACKGROUND

9. On or about March 6, 2020, members of TFG-51 were contacted by DEA Special Agent Keith Headley of the Charlotte, N.C. District Office, regarding a suspicious package intended for Philadelphia, PA. Agent Headley informed you affiant that, during his March 5, 2020, surveillance of individuals believed to be associated with a known money laundering organization, he and his colleagues observed three men bring a box from inside of a Charlotte, N.C.-area home to the UPS Store located at 8116 S. Tryon St., Suite B3, Charlotte, N.C.

10. After the three men departed the UPS Store, Agents interviewed employees of the UPS Store who supplied Agents with the following packing information for the box, hereafter referred to as the SUBJECT PARCEL:

| Parcel Shipping Order (PSO) Terms and Conditions #3709 | | THE UPS STORE |
|---|---|---|
| Ship Date: Thu 05 Mar 2020 | Shipment Information: UPS 2ND DAY RES: 1 PACKAGE TOTAL DECLARED VALUE | Description Of Goods: SHOES PAPERAS |
| SENDER DANIEL SOLIS 12214 KOUSA PL CHARLOTTE, NC 28278 TEL: (980) 555-6142 | RECIPIENT NALLEY GUTIEREZ 2600 WELSH RD APT 50 PHILADELPHI, PA 19152-1442 | PKG TRAKING NUMBER 1  1Z7A068RPW60280593 |

11. Review of law enforcement databases showed that no one by the name "Daniel SOLIS" was associated with the return address of 12214 Kousa Pl., Charlotte, NC 28278. Furthermore, that review also showed that no one by the name "Nalley GUTIEREZ" was associated with the recipient address of 2600 Welsh Rd., Apt 50, Philadelphia, PA 19152. Based on my training and experience, your Affiant knows drug traffickers who utilize carriers like UPS will frequently include false names both for the sender and for the recipient so as to distance themselves from the drug trafficking.

12. Based on the tracking number associated with SUBJECT PARCEL, Agents concluded that the package would be received on March 7, 2020 at the UPS facility located at 15 E. Oregon Ave., Philadelphia, PA, in the Eastern District of Pennsylvania (the "UPS Facility"). At approximately 9:00 a.m., your Affiant and Task Force Officer Dale Keddie located the SUBJECT PARCEL at the UPS Facility. The SUBJECT PARCEL bore the previously referenced shipping information, as well as the tracking number.

13. TFO Keddie directed his Police Service Dog "Ninja," to sniff the package, which resulted in a positive response by Ninja to the presence of narcotics.[1]

## PROBABLE CAUSE

14. Based on the foregoing, on March 7, 2020, the Honorable David R. Strawbridge issued a search warrant, authorizing your affiant to open the SUBJECT PARCEL.

15. Your affiant opened the SUBJECT PARCEL and found two packages. The packages were wrapped together in a substantial amount of clear cellophane wrapping. Between the layers of the cellophane wrapping, agents observed various pungent smelling liquids and powders. Based on my training and experience I know that individuals who transport narcotics through the mail will often package the narcotics with pungent non-narcotic substances in an effort to confuse drug canines.

16. Upon removing the cellophane, agents observed two discrete packages. One package contained a brown rock-like substance that field tested positive for heroin. The second package contained a compressed white powder, which field tested positive for fentanyl.

17. The street value of one kilogram of heroin is approximately $60,000. The street value of one kilogram of fentanyl is approximately $50,000.

18. Agents intend to execute a controlled delivery of the SUBJECT PARCEL to the SUBJECT LOCATION. Prior to delivery, agents will remove the suspected narcotics from the

---

[1] Police Service Dog "Ninja" was certified with her handler, TFO Dale Keddie, by Tarheel Canine Training Inc. Police K-9 Services in Sanford, North Carolina, on July 21, 2011, after successfully completing 120 hours of training. Ninja was trained to detect the odor of four controlled substances marijuana, cocaine, heroin, and methamphetamine. TFO Keddie is a sworn police officer for the Bucks County District Attorney's Office and has been so employed as a police officer in the County of Bucks since April of 1993. During this time, TFO Keddie has utilized Ninja in numerous narcotics investigations, in which Ninja's positive indication for narcotics was confirmed, and that have resulted in several drug seizures. K-9 Ninja and TFO Keddie train monthly on all odors the dog is trained to detect. Yearly, TFO Keddie and K-9 Ninja are recertified through the Bucks County District Attorney's Office Narcotics Detection Dog Certification. Det. Keddie and K-9 Ninja are currently assigned to the DEA Task Force, Philadelphia Division

parcel and replace it with a sham substance similar in appearance to the original contents of the package. Then, an agent posing as a UPS carrier will deliver the SUBJECT PARCEL to the SUBJECT LOCATION.

19. At this time, law enforcement does not know who or how many people reside inside the SUBJECT LOCATION. Based upon my training and experience, it is difficult to determine precisely when the recipient or intended recipient will open the subject parcel to retrieve the substance inside. Therefore, law enforcement will deliver the parcel with the substance contained inside along with a tracking device, and will use the tracking device to monitor the whereabouts of the parcel in question at all times, including those times when the package has entered the SUBJECT LOCATION or other private property.

20. Agents conducted surveillance on March 7, 2020 of the SUBJECT LOCATION. When a UPS delivery truck pulled up outside the SUBJECT LOCATION, agents observed a Hispanic male open the front door, look toward the front steps of the SUBJECT LOCATION and the delivery truck, and then close the door. There is probable cause to believe that the Hispanic male was looking for the SUBJECT PARCEL.

21. The tracking device is a transmitter only and will not monitor voice conversations. Because law enforcement expects that the parcel will be taken into a private residence when the parcel is picked up, the Tracker Warrant authorizes law enforcement to monitor the signals of the transponder in private areas, such as buildings, residences and other like closed structures, which are not public. The SUBJECT LOCATION is a private residence.

22. It has been the experience of law enforcement that the intended recipients of parcels containing illegal narcotics often have the drug parcels mailed to addresses they are not associated with in order distance them from being arrested during a controlled delivery. In those

situations, after the delivery is made, the signer generally transports the drug parcel to another location, or the intended recipient picks up the parcel and drives it to another location.

23. At this time, law enforcement does not know the ultimate destination of the parcel. Law enforcement will deliver the parcel with the substance contained inside along with the GPS, and will use the GPS to monitor the whereabouts of the parcel in question at all times, including those times when the package has entered the residence or other private property, including at its ultimate destination. The GPS device will allow law enforcement to follow the parcel if and when the package is taken to another location.

24. Although members of law enforcement will deliver the parcel during daylight hours, they do not know when the SUBJECT PARCEL will be accepted into the SUBJECT LOCATION by the intended recipient or recipients. When the SUBJECT PARCEL is accepted into the SUBJECT LOCATION, the receiving individuals may learn that the SUBJECT PARCEL does not contain the drugs that they are expecting. As a result, they may destroy evidence or otherwise take actions which would prevent law enforcement from recovering evidence located inside the premises or to otherwise identify individuals involved in criminal activity. Accordingly, since the SUBJECT PARCEL may be accepted into the SUBJECT LOCATION after daytime hours and may result in the destruction of evidence, additional authority is sought to enter and search the SUBJECT LOCATION if the package is accepted into the SUBJECT LOCATION between the hours of 10:00 p.m. and 6:00 a.m.

25. Based on my training and experience, there is probable cause to believe that individuals who engage in narcotics trafficking through the mail will often accept a package of narcotics into a location that contains the evidence and instrumentalities of narcotics trafficking. For example, there is probable cause to believe that such a location would contain the packaging

materials necessary to process the wholesale quantities of narcotics found in the SUBJECT PARCEL into quantities appropriate for street-level sales. In the event that the SUBJECT PARCEL is accepted into the SUBJECT LOCATION, there is probable cause to believe that the SUBJECT LOCATION will contain the instrumentalities of narcotics trafficking set forth more fully at Attachment B.

## LOCATION TO BE SEARCHED

26. This Affidavit is made in support of a Search Warrant Application for authority to search the premises located at 2600 Welsh Road, Apartment No. 50, Pennsylvania 19152, more particularly described in "Attachment A" hereto, and for authority to seize evidence, fruits, and instrumentalities, of crimes against the United States, specifically, in violation of Title 21, United States Code, Sections 841 and 843(b), as more particularly described in "Attachment B" hereto.

27. The condition precedent to the search of the TARGET LOCATION is the SUBJECT PARCEL's entrance into the TARGET LOCATION.

## CONCLUSION

28. This Application seeks authority to enter Target Location and to search for and seize fruits, evidence, and/or instrumentalities of the specified federal offenses. More particularly, there is probable cause to believe that at the Target Location, at the time of the execution of the Search Warrant, that is upon satisfaction of the condition precedent that the parcels are accepted and taken inside of the premises, there will be the items, materials, and objects described in Attachment B to the Search Warrant in the Target Location, which is incorporated herein as set forth in full. As a result, there is probable cause to believe that at the Target Location, there is now and will be located the fruits, evidence and instrumentalities as set forth in Attachment B.

29. Accordingly, I respectfully request that the Court issue a Search Warrant for the SUBJECT LOCATION, which law enforcement may execute once the aforementioned parcel is received at that location. I also request authority to include a GPS Tracking Device in the SUBJECT PARCEL.

James W. Crockett
DEA Special Agent

Sworn to and Subscribed Before Me
This 7th day of March, 2020

David Strawbridge /JM
HON. DAVID STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE
per auth. of Hon. D. Strawbridge (telephonically)
in the presence of AUSA Mannion

Confirmed as stated
3-9-20
DLCNSTD USMJ

## ATTACHMENT A
## PROPERTY TO BE SEARCHED

The premises located at 2600 Welsh Road, Apartment No. 50, Philadelphia, PA. The premises is a two-story red brick row home with a white and gray awning over the front door of the residence. The premises has a white front door, which is the left-most (from the perspective of the viewer) of the two doors under the awning. The apartment number, 50, is displayed on a white placard to the right of the front door (from the perspective of the viewer). It has concrete steps leading to the property's front door. There is a back garage door associated to Apartment No. 50.





## ATTACHMENT B
### (Property to be Seized)

Evidence which constitutes fruits, evidence and/or instrumentalities of violations of Title 21, United States Code, Sections 841, 843(b) and 846 including the following:

1. An approximately 8.8 pound UPS package addressed to 2600 Welsh Road, Apartment No. 50, Philadelphia, PA 19152-1442, bearing the tracking number 1Z7A068RPW60280593;

2. Any and all firearms and ammunition;

3. Drug trafficking paraphernalia, including packaging materials (such as plastic baggies, paper bindles, glass jars, wrapping paper, and cellophane, etc.), scales to weigh controlled substances, and cutting agents and diluents to stretch the quantity of the controlled substance so they can increase their supply and profit;

4. All the records, documents, and materials (including both originals and copies) described below, in whatever form/format and by whatever means such records, documents, and materials, their drafts, or their modifications may have been created or stored, including but not limited to any (a) handmade or written form, (b) photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motions pictures, or photocopies), and mechanical form (such as printing or typing), and (c) electrical, electronic, or magnetic form (such as tape recordings, cassettes, compact discs, or any information on an electronic or magnetic storage device, such as floppy diskettes, hard disks, storage drives, CD-ROMs, DVDs, optical discs, printer buffers, smart cards, memory calculators, electronic dialers, computers, or electronic notebooks, as well as printouts or readouts from any such storage device);

5. Any and all records and documents relating in any way to any and all financial transactions, regardless of the identity of the person(s) involved in the transactions;

6. Any and all records and documents relating in any way to the possession, sale, purchase, transfer, and/or storage of any and all tangible or intangible assets, including but not limited to vehicles, real estate, and jewelry, regardless of the identity of the person(s) involved;

7. Any and all business records, including but not limited to accounts receivable, accounts payable, general ledgers, cash disbursement ledger, check register, employment records, and correspondence, regardless of the identity of the person(s) involved in the transactions;

8. Any and all indicia of ownership of the SUBJECT LOCATION, including

but not limited to birth certificates, state identification cards, social security cards, and driver's licenses;

9. Any and all banking records, including but not limited to monthly savings and checking statements, canceled checks and banking communications, deposit tickets, withdrawal receipts, certificates of deposits, pass-books, money drafts, money orders (blank or endorsed), check cashing logs, wire transfer logs, cashier's checks, bank checks, money orders, safe deposit box keys, safes, money wrappers and wire transfers;

10. Any and all United States currency, money counters and any item used in the counting of currency;

11. Any and all cellular telephones and electronic communication devices;

12. Travel documents, including airline tickets, receipts, correspondence.